# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NORTHEASTERN DIVISION

| | |
|---|---|
| WALLACE CALDWELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.: 2:14-00071 |
| ) | Judge Sharp |
| OMEGA APPAREL INCORPORATED, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Pending before the Court in this disability and age discrimination case is Defendant Omega Apparel Incorporated's Motion for Summary Judgment (Docket No. 15). Plaintiff Wallace Caldwell has responded in opposition to that Motion, to which Defendant has filed a reply. For the reasons that follow, the Motion for Summary Judgment will be granted except with respect to Plaintiff's federal disability discrimination claim.

### I. Factual Background

Omega, of Smithville, Tennessee, produces uniforms for the United States Department of Defense. At the time of events underlying this litigation, Omega had contracts with each of the five uniformed branches to make dress pants and skirts.

Approximately 200 individuals work at Omega, 80% of whom are sewers. Its owner, President, and Chief Executive Officer is Dean Wegner.

Omega employees work out of two buildings. One building houses the cutting operation; the other holds the administrative offices and the sewing lines.

Plaintiff began working at Omega in 2000, but was laid off in 2005. In 2010, he returned and

1

worked as a "cutter." In that position, he used a straight knife cutting machine[1] to cut cloth that met certain specifications for quality and measurement.

Cutters are required to precisely cut patterns, with only a slight margin of error permissible. Under the standard operating procedures for cutting, a copy of which Plaintiff signed on February 11, 2011, cutters are only allowed to leave 1/16th of an inch on the outside of the line of the pattern.

On March 25, 2013, Plaintiff woke up with reduced vision in his right eye, experiencing what he described as "looking through a hole." Nevertheless, he picked up a co-worker and drove to Omega.

Plaintiff began work in the cutting room at 6:00 a.m.. He then worked for approximately an hour, making 20 cuts with his machine. Those cuts were within specifications.

Sometime after Cynthia Pollard, the Quality Manager and Plaintiff's direct supervisor, arrived at work around 7:00, Plaintiff told her that he was having difficulty with his right eye, and asked to take a personal day so that he could see an eye doctor. That request was granted.

Plaintiff's wife arranged for him to be seen by Dr. David L. Foutch, an optometrist, at 8:00 a.m., and drove him to the appointment. According to Plaintiff, Dr. Foutch examined his eyes, told him he believed there was some kind of occlusion on the back of the right eye, and suggested that he see a specialist. Plaintiff was referred to Dr. Alissa Hudson, an opthomologist at Middle Tennessee Eye Associates.

That same morning, Plaintiff was seen by Dr. Hudson. According to Plaintiff, Dr. Hudson said that he had a retinal occlusion which may have been caused by a blood clot from a piece of plaque.

---

[1] In his deposition, Plaintiff testified that the blade on the machine was 7" long and reciprocated approximately 3,200 times per minute.

Plaintiff testified in his deposition that Dr. Hudson informed him that he would "have to get used to and adjusted to [his] depth perception, but that several of her other patients "had the same thing" and "carried on their employment." (Docket No. 28-1, Plf. Depo. at 85). He conceded, however, that while he told Dr. Hudson that he worked as a cutter, he did not tell her about how he made cuts or what equipment he used. He also conceded in his deposition that "depth perception was an issue at that current time." (Id. at 86).

Prior to leaving the office, Dr. Hudson arranged for Plaintiff to see his cardiologist. She also gave him a work excuse that read:



(Docket No. 18 at 4).

That morning, Plaintiff was also seen by his cardiologist, Dr. Stacy Brewington. Dr. Brewington was unable to discover whether plaque was the cause of the occlusion, but placed

3

Plaintiff on a blood thinner for 30 days as a precaution.

That same afternoon, Plaintiff returned to Omega, and presented Connie Jolley, the Office Manager, with the note from Dr. Hudson. After Plaintiff spoke with a co-worker outside for approximately 20 minutes, he was told by Ms. Jolley that he needed to return to the office building and see Joel Glover, the Human Resources Manager.

According to Plaintiff, when he went to Mr. Glover's office, he saw Dr. Hudson's note and a copy the employee's handbook on the desk. Plaintiff's claims that Mr. Glover told him, "I don't have nothing for you" and when Plaintiff asked whether he was being terminated, Mr. Glover stated "call it whatever you want to, but I have nothing for you to do." (Pf. Depo. at 97-98). Plaintiff further claims that, when he asked whether an exception could be made, Mr. Glover stated, "if I make an exception for you, I have to make an exception for everyone." (Id. at 99).

On March 26, 2013, Plaintiff was terminated from his employment with Omega. Plaintiff was given a Separation Notice indicating the reason for the termination was that he was "physically unable to perform the job requirement." (Id. at 138).

On April 8, 2013, Ms. Jolley offered Plaintiff a job in the purchasing department. Plaintiff refused the job because it paid substantially less than he made as a cutter.[2]

After Plaintiff's termination, two individuals were hired into the cutting department: Michael Richardson, who was then 49 years old, and Randall Burger, who was then 22 years old. As of the date of Plaintiff's deposition on May 13, 2015, Plaintiff's condition in his right eye had not changed or improved. (Wegner Decl. ¶ 7).

Based upon the foregoing events, Plaintiff filed suit alleging age and disability discrimination.

---

[2] The purchasing job he was offered paid $9.00 per hour, $4.52 less per hour than Plaintiff made as a cutter. Plaintiff is unaware of any other jobs available at Omega that pay as much as he was paid as a cutter.

He brings claims under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"); the Americans With Disabilities Act (and the Amendments Act of 2008), 42 U.S.C. § 12101 *et seq.* ("ADA"); and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq.* ("THRA"). Defendant seeks summary judgment on all claims.

## II. Standard Review

The standards governing summary judgment are well known. A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox Cnty, School Sys., 205 F.3d 912, 914 (6th Cir. 2000). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. Application of Law

As noted, Plaintiff brings employment discrimination claims under both federal and state law. However, because "[t]he intent of the THRA is to provide for execution within Tennessee of the policies embodied in the federal civil rights statutes," Lynch v. City of Jellico, 205 S.W.3d 384, 399 (Tenn. 2006), state law age discrimination claims are analyzed in the same manner as claims brought under the ADEA, Tenn. Code Ann. § 4-21-101, and disability discrimination claims are analyzed in the same manner as ADA claims, Sasser v. Quebecor Printing (USA) Corporation, 159 S.W.3d 579, 584 (Tenn. App. 2004), including the McDonnell–Douglas burden-shifting framework that the Tennessee legislature codified for all claims filed after June 10, 2010, Tenn. Code Ann. § 4–21–311

5

(2011).

## A. Age Discrimination

"The ADEA prohibits an employer from failing or refusing to hire, discharging, or discriminating 'against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[.]'" Geiger v. Tower Auto., 579 F.3d 614, 620 (6th Cir. 2009) (quoting 29 U.S.C. § 623(a)(1)). With substantially similarly language, the THRA also prohibits disparate treatment based on age by making it a "discriminatory practice for an employer to . . . [f]ail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's . . . age[.]" Tenn. Code Ann. § 4-21-401(a)(1). As with all disparate treatment claims, a plaintiff may show discrimination through either direct evidence or circumstantial evidence.

"'Direct evidence is evidence that proves the existence of a fact without requiring any inferences.'" Minadeo v. ICI Paints, 398 F.3d 751, 763 (6th Cir. 2005) (quoting Rowan v. Lockheed Martin Energy Systems, 360 F.3d 544, 548 (6th Cir. 2004). Id. at 548. "If a plaintiff succeeds in presenting direct evidence of a discriminatory motive, 'the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive.'" Id. (quoting, DiCarlo v. Potter, 358 F.3d 408, 415 (6th Cir.2004)).

"A plaintiff without direct evidence of discrimination can establish a *prima facie* case of age discrimination by showing: (1) []he was at least 40 years old at the time of the alleged discrimination; (2) []he was subjected to an adverse employment action; (3) []he was otherwise qualified for the position; and (4) []he was replaced by a younger worker, or there are circumstances that support an inference of discrimination." Moffat v. Wal-Mart Stores, Inc., 2015 WL 4880135, at *4 (6th Cir. Aug. 17, 2015). If that initial burden is met, the burden of production shifts to the employer to

"articulate some legitimate, nondiscriminatory reason" for the adverse action and, if it does so, the burden shifts back to the [plaintiff] to show that the proffered reason is a mere pretext masking the company's discriminatory actions." Bender v. Hecht's Dep't Stores, 455 F.3d 612, 624 (6th Cir. 2006).

Regardless of the method utilized, "[t]he key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination.'" Moffat, 2015 WL 4880135 at *4 (quoting, Clay v. United Parcel Serv., Inc., 501 F.3d 695, 703 (6th Cir. 2007)). Plaintiff has not done so in this case.

Leaving aside Plaintiff's discussion of the applicable law, the entirety of his age discrimination argument is set forth in his reply brief as follows:

> [T]here is ample evidence to suggest that Plaintiff's age was the true motivating factor in the decision to terminate Plaintiff. Prior to his termination, Plaintiff was concerned that his supervisor, Connie Jolley, would retaliate against him if the opportunity to do so presented itself. (Caldwell Dep. 197-198). Ms. Jolley told Plaintiff on multiple occasions that he was "getting too old for" his position. (Caldwell Dep. 143-144). Although Plaintiff took no offense to these comments at the time, he later realized Ms. Jolley may have been expressing more animus towards Plaintiff than he originally suspected. (*Id*.) Additionally, Plaintiff discovered Ms. Jolley had taken steps to keep Plaintiff from receiving a promotion from Mr. Wegner. (Caldwell Dep. 149, 151-155). Ms. Jolley informed Mr. Wegner that she felt Plaintiff would not be best for a promotion to supervisor because Plaintiff was older, closer to retirement, and had health issues related to a pre-existing heart condition. (*Id*.) Following Plaintiff's termination, he was informed that his replacement was an individual who was significantly younger than Plaintiff. (Caldwell Dep. 141-142).

(Docket No.26 at 12-13).

Plaintiff does not assert whether Ms Jolley's alleged statements constitute direct or indirect evidence. Arguably it could be either. See, Blair v. Henry Filters, Inc., 505 F.3d 517 (6th Cir.2007) (direct supervisor's statement to employee that he was "too old" to handle a certain account could

7

be direct evidence of age discrimination if employee was removed from the account, but would be indirect evidence that the employee was terminated because of his age). But no matter how characterized, there must be some linkage between the statement and the adverse employment action.

"[T]he question to be asked in deciding an employer's motion for summary judgment is whether the evidence, taken as a whole and in the light most favorable to plaintiff, is sufficient to permit a rational trier of fact to conclude 'that age was the but-for cause' of the challenged employer decision." Scheick v. Tecumseh Pub. Sch., 766 F.3d 523, 532 (6th Cir. 2014) (quoting Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 178 (2009)). For at least three reasons, that question must be answered in the negative in this case.

First, Plaintiff has failed to show a temporal proximity between Ms. Jolley's alleged statement and his termination. Second, the statements (even if made) were not shown to have been made by the decisionmaker. Third, even if Ms. Jolley was the decisionmaker or influenced the actual decisionmaker, the statements were alleged to have been made in the context of a promotion decision, not the termination decision at issue in this case. See, Skelton v. Sara Lee Corp., 249 Fed.Appx. 450, 455 (6th Cir. 2007) (summary judgment appropriate in age discrimination case where (1) supervisor "may have been a 'decision-maker in his position as a supervisor for Defendant," but there was "absolutely no evidence to suggest that [he] was a decision-maker with regard to the decision to terminate" plaintiff; (2) there was "no evidence that "supervisor's statement was in any way related to Defendant's decision-making process"; and (3) it was "unclear whether [supervisor's] comment was made 'proximate in time' to Defendant's decision to terminate"); Peters v. Lincoln Elec. Co., 285 F.3d 456, 477-78 (6th Cir. 2002) ("in age discrimination cases, statements allegedly showing an employer's age bias are to be evaluated by considering four factors: (1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the

8

statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination").

Accordingly, summary judgment will be granted on Plaintiff's age discrimination claims under both the ADEA and THRA.

**B. Disability Discrimination**

The ADA prohibits covered employers from discriminating against a "qualified individual on the basis of disability" with regard to hiring, advancement, training, termination, and "other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Similarly, the Tennessee Handicap Act ("THA") which "embodies the definitions and remedies provided by the Tennessee Human Rights Act," Barnes v. Goodyear Tire & Rubber Co., 48 S.W.3d 698, 705 (Tenn. 2000) provides that there "shall be no discrimination in the hiring, firing and other terms and conditions of employment . . . based solely upon any physical, mental or visual disability of the applicant, unless such disability to some degree prevents the applicant from performing the duties required by the employment sought or impairs the performance of the work involved." Tenn. Code Ann. § 8-50-103.

In the absence of direct evidence (and Plaintiff suggests none here), disability discrimination claims are also analyzed under the familiar burden shifting approach. "To make out a *prima facie case* of employment discrimination through indirect evidence under [the ADA], a plaintiff must show that '1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced.'" Whitfield v. Tenn., 639 F.3d 253, 258-59 (6th Cir. 2011) (quoting Macy v. Hopkins Cnty. Sch. Bd. of Educ., 484 F.3d 357, 365 (6th Cir. 2007)).

9

"Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason' for its actions." Talley v. Family Dollar Stores of Ohio, Inc., 542 F.3d 1099, 1105 (6th Cir. 2008) (quoting, Gribcheck v. Runyon, 245 F.3d 547, 550 (6th Cir. 2001). "If the defendant can satisfy its burden, the plaintiff must show by a preponderance of the evidence that the proffered explanation is a pretext for discrimination." Id.

Omega argues that Plaintiff's disability discrimination claims fail because (1) he could not perform the essential functions of his job, i.e., safely and accurately cutting fabric; (2) it had a legitimate non-discriminatory reason for terminating Plaintiff's employment, i.e., keeping Plaintiff from hurting himself; and (3) Plaintiff cannot show this stated reason to be pretextual. In response, Plaintiff observes that (1) he operated the machine for an hour without incident and within specification; (2) he informed Dr. Hudson that he worked as a cutter and allegedly was told by her that he would be "able to get used to" his depth perception issue; and (3) Dr. Hudson "did not issue any restrictions other than being off for the day of March 25, 2013." (Docket No. 26 at 8).

Central to the parties' positions is Dr. Hudson's work excuse for Plaintiff. Omega reads the note as "stating that he had '[d]amage to [d]epth perception – unlikely for resolution' and that he could work 'but not [with]³ depth perception issue.'" (Docket No. 16 at 4, brackets in original). Plaintiff asserts that, properly read, Dr. Hudson stated there was "damage to depth perception" but that they were "waiting for resolution" and that "he can work but *note* depth perception issue." (Docket No. 26 at 7-8, italics in original).

Both readings are possible and, in fact, what Omega reads as "unlikely for resolution," and Plaintiff reads as "waiting for resolution," may actually be "watching for resolution." However,

---

³ Omega reads what may be a " c̄ " as the standard medical abbreviation for "with".

attempting to decipher Dr. Hudson's handwritten is an exercise which may well not have been necessary had Omega engaged in the interactive process contemplated by the ADA.

Under the ADA "[t]he term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position[.]" 42 U.S.C. § 12111(8). The governing regulations indicate that "[t]o determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee]," in order to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). "Accordingly, '[t]he interactive process requires communication and good-faith exploration of possible accommodations.'" Kleiber v. Honda of Am. Mfg., Inc., 485 F.3d 862, 871 (6th Cir. 2007) (citation omitted). "Even though the interactive process is not described in the statute's text, the interactive process is mandatory, and both parties have a duty to participate in good faith." Id. (footnote omitted).

"The ADA mandates this process to ensure that employers do not disqualify applicants and employees based on 'stereotypes and generalizations about a disability, but based on the actual disability and the effect that disability has on the particular individual's ability to perform the job.'" Rorrer v. City of Stow, 743 F.3d 1025, 1040-41 (6th Cir. 2014) (quoting Keith v. Cnty. of Oakland, 703 F.3d 918, 923 (6th Cir. 2013). "'If this process fails to lead to reasonable accommodation of the disabled employee's limitations, responsibility will lie with the party that caused the breakdown.'" Id. (quoting EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 805 (7th Cir. 2005)).

Here, when the facts are construed in Plaintiff's favor, a reasonable jury could conclude that Omega wholly failed to engage in an interactive process and failed to make any effort to to determine

11

whether it could reasonably accommodate Plaintiff's condition.[4] Rather, the facts so construed suggest that within one-half hour of presenting Dr. Hudson's note, Plaintiff was summoned to the Human Resources Manager's office and fired. Additionally, his request for an "exception" was summarily dismissed. "Failing to discuss a reasonable accommodation in a meeting in which the employer takes an adverse employment action against an injured employee may demonstrate a lack of good faith, as may "failing to assist an employee in seeking an accomodation[. ]" Id.

In arriving at this conclusion, the Court recognizes that, two-weeks after termination, Plaintiff was offered a job in purchasing. However, whether this position (offering lesser pay) was a reasonable accommodation is a question for the jury, particularly since Omega apparently made no effort to explore whether Plaintiff could perform his job as a cutter without danger to himself or others. Further, the fact that Plaintiff still has depth perception issues does not alter this conclusion because Omega "cannot now argue, with the benefit of hindsight, that its actions were justified." Gibson v. Lafayette Manor, Inc., 2007 WL 951473, at * 9 (W.D. Pa. Mar. 27, 2007); see also, Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 655 (1st Cir. 2000) ("the prospect of recovery (or enablement) should be judged not by hindsight, but by what reasonably appears at the time the leave is requested"); Klene v. Trustees of Indiana Univ., 2010 WL 2985176, at * (S.D. Ind. July 23, 2010) (in disability discrimination case where student alleged that university failed to accommodate her with respect to the fulfillment of a practicum requirement, "[u]sing hindsight to evaluate the viability of a practicum is not a basis on which to evaluate whether [the university] made reasonable accommodations").

---

[4] In its moving papers, Omega fails to discuss the interactive active process required by the ADA. Even when that failure was noted in Plaintiff's response, Omega did not even mention the term "interactive process" in its reply.

Based on the foregoing, the Court will deny summary judgment on Plaintiff's claim under the ADA. The Court will, however, grant summary judgment insofar as Plaintiff is claiming disability discrimination under Tennessee law. This is because the TDA "do[es] not include a 'reasonable accommodation' component," Bennett v. Nissan No. Am., Inc., 315 S.W.3d 832, 842 (Tenn. Ct. App. 2009), and, necessarily no requirement for engaging in an interactive process to determine such an accommodation. See also, Krueger v. Herschend Family Entm't Corp., 2015 WL 6554727, at *11 (E.D. Tenn. Oct. 29, 2015) (collecting cases) ("It is well settled . . . that the TDA does not require employers to make reasonable accommodations for employees that cannot perform the essential functions of their jobs").

## IV. Conclusion

On the basis of the foregoing, the Court will enter an Order granting Defendant's Motion for Summary Judgment, except with respect to Plaintiff's disability discrimination claim under the ADA.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE